Good morning. May it please the Court, I'm Aubrey Fletcher for Petitioner. In our opening brief, we argued that the Board and the IJ in their decisions focused exclusively on whether Petitioner had established Could you pull the microphone down a little bit? It's hard to hear you right now. Is this better? Yeah. Okay. So we argued that the Board and the IJ looked only at whether Petitioner had established past persecution on account of protected ground and not at whether he had established a well-founded fear of future persecution on account of a protected ground. And the Government's position is that the Board and the IJ did address the future persecution issue. Even if the Court accepts the Government's position on that point, it still must reverse the decisions below and find Petitioner statutorily eligible for asylum. Petitioner has provided compelling evidence that he satisfied his burden of proof and established a well-founded fear of future persecution. Slow down a bit. Oh, yes. I'm sorry. I can't hear you better. Okay. I apologize, Your Honor. No, that's much better. I think you were away from the mic. This is better? Yes. Okay. So the Board made no adverse credibility finding. The facts here are undisputed. The issue is the nexus between the harm Petitioner suffered and will suffer in Nepal and a protected ground here, his political opinion. The agency concluded that the harm he suffered was criminal activity, specifically extortion and robbery, and not related to his political opinion. The burden on Petitioner regarding that issue was simply to provide evidence from which it is reasonable to believe that the harm was or would be motivated, at least in part, by a protected ground. That's the burden as articulated, I'm paraphrasing, but as articulated in this Court's opinion in Borja. Counsel, I noted two places where the Maoist groups sent a letter that named Mr. Rajachetri by name. Correct. And that would be the one found on page 397 of the record. Yes. And then there was an additional one I think found on page 396. Is there anything else other than those two? One's called a warning letter and the other one's called a re-warning letter. Are those the only two instances in which we know that the Maoists had identified him by name? Well, they also came to his home after that while he was still in hiding away from his village. That's in his testimony before the Court that they came. There was no written threat at that time, but they came. They extorted the family again, yet they went beyond extorting the family, robbing them of their money, and threatened him again, issued another death threat against Petitioner specifically and demanded to know where he was. So those are, I suppose, the three instances in which they looked for him by name. Is there any evidence in the record as to whether other people in the village were identified by name by this group? There is no evidence about that. So the first encounter where there was no letter addressed to him by name, the Maoists did go to other houses in the village. But then he says that on, oh, I'm sorry, let me look. There was one point in his testimony that he said they came particularly to his house, and that was his word. You're losing the microphone. Oh, I'm sorry. There was another instance when they came particularly to his house. But to answer your question more directly, there's not evidence that they were looking at other people by name in the village. And since he left his village, what contact has his family had with the Maoist groups? As I said, they came again to his home, physically harmed his mother and sister, robbed the family, and threatened him again. I would also like to point out that the letter, the one that's at page 396, the one that mentions the article, that letter was delivered four days after the article was published, which I don't think the agency or the government in its briefing really focused on. So what happened is he publishes this article, which is on the record at page 362, criticizing the Maoists and calling on society to join the Nepali Congress Party and oppose the Maoists. In fact, the- Maybe if you move the microphone. I don't know what it is, but at some points you hear- I'm sorry. You can hear it coming through the mic, and at other points it's just you. I'm just going to get really close to it, uncomfortably close. Okay. So the article he published, the headline is Maoist Shame on Nation. And he roundly denounces the Maoists. He calls on all youth, senior citizens, doctors, engineers, et cetera, to be active and uproot the dangerous attitude of the Maoists from society by joining the Nepali Congress. Four days after publishing that, the Maoists came to his family's home when he was not there and brought that letter that mentions the letter, tells him not to publish articles like that, mentions the article, excuse me, tells him not to publish articles like that in the future, tells him he's on a red list, and tells him that, well, it threatens his life. Also, there's documentary evidence on the record regarding- If I've got the facts right, there were two occasions after the- after he left where they came to his house looking for him. I've got one on December 25th and one on January 7th. Is that right? Also on December 4th or 5th. When was the article published? December 1st, 1997. So in his, I believe, his declaration and his testimony at the immigration court- December 25th was the day of one of the letters. That was the third letter, yes. The second letter was early December, right after the article was published. They came on December 25th looking for him and beat his mother and sister, and then what, I don't know what the next- there's another date that says he left Nepal on January 7th, and they subsequently returned to his house. Correct. Do you know when that was? I don't know the date. It may be in the record, but I don't know it. And they told the family they were looking for him? Correct. Then they called several times. How did they call? How did they call? A telephone person? Oh, I assume so. Yes, telephone was my reading of it. And the family fled to, I believe, Kathmandu, and they continued to call them there. Yeah, I think it was, because it says they continued the threatening phone calls. Yes, phone calls. Okay. Is there anything in the record from the State Department on what the activities of the Nepal Communist Party are today? Oh, today? Yeah. No, the most recent State Department report on the record is for 2003. And what was the report then? That report, this is around page 229 or so of the record, that report describes how the Maoists have targeted local political leaders and political activists. It talks about how the Maoists have killed journalists and threatened the lives of journalists who criticized the Maoists in the paper who reported without permission. And then there's also a 2002 State Department report which mentions Maoists physically attacking members of the Nepali Congress Party. And there are also Amnesty International reports in the record as well that talk about the targeting of the Nepali Congress members and people who denounced the Maoists in the press. You have a minute and a half left. Oh, I'd like to reserve that if I may. Yes. Thank you. Counsel? Please, the Court. I'm Susan Green for the Attorney General. This case is really about a narrow factual issue, and that is given that the initial attack on the Ranchetri family, the robbery, was only a robbery. It had nothing to do with Ranchetri's expression of his political opinion. The question is whether anything in the course of the- When they left, didn't they shout something about their relationship with the Maoists? Yes, sir. They said long live Maoism, but they didn't say anything about the family's position. They didn't indicate that they knew anything about the family's political position. If that were the case, why would they shout that? Oh, I think that's just their slogan. That's like their high fives. After every robbery? I suppose. But that didn't indicate that they knew what Ranchetri's political opinion was or they were motivated. They were clearly robbing people in pursuance of their own policy of getting money to support their political mission. No indication that they were centering on people that were of that party? No, sir, there's not. In fact, the evidence is that they went around the whole village. They robbed and injured people throughout the village, and Ranchetri said that, and he said it both in his affidavit and in his testimony, and the board found that. So the question is, I think even I'll point out on Ranchetri's brief on pages 25 and 26, he says while the Maoists who attacked Ranchetri may have been initially motivated only by a desire to raise funds, their encounters with Ranchetri took a decidedly political turn once he publicly denounced their campaign of extortion. So the whole question. Isn't that correct? No, that's my whole point. It did not take a turn once he published his letter. There was the robbery, and then about six months later, they came back and they delivered a letter asking for 165,000 rupees. There's no question that initially it was purely economic. Right. Then it became mixed, right? No, I don't agree with that. The second letter doesn't show that there was mixed motive? No, what there was was there was a series of three letters, and they were clear. The second letter I'm talking about. Yes, sir, but I think that the board looked at those three letters as a course of conduct. All three of those letters demanded the 165,000 rupees, and all three of the letters conveyed threats. Of those three letters, the second letter has one sentence, and it does refer to this newspaper article. But clearly looking at the second letter, the second letter refers back to the letter of October 26th, so they refer back to their first letter, which was all about money. They go on. There is the one sentence about the newspaper article, but it doesn't directly link it to a threat. And then they go back to their main theme, and that is, our party listed you in the red list. You will face action anywhere. Deposit money as soon as, and save your life. And then, tellingly. The rule is that if initially there's a single motive that's economic, and then they learn of your political opinion and opposition, that then that will be a mixed motive. No, it's not enough that they learn of the political opinion. In the cases, the Ninth Circuit cases dealing with this kind of situation, the court has very much emphasized that there was something, a change in the conduct of the person that was doing the extortion that indicated that they were then, they had changed or become more extreme, or their persecution was more, was worse after the expression of the political opinion. I could read from. Had there been any physical assaults on him or his family before they learned of his political opinion? Oh, yes, sir. Absolutely. By far the worst episode in this case was the initial episode in which they came in. They broke down the door to the house. It was a home invasion. Roy Tetre stood up to confront them, and they hit him in the head with a rifle bat. And then they said, the first thing they said was, where's the money? Then they hit him in the head. Then they approached his mother and also asked her where's the money. She didn't tell them, and they broke her leg. So by far the worst incident. Were there any threats to kill before the political opinion? There were threats. The threats, all the threats are somewhat ambiguous and vague, but there definitely was a threat in the first letter before he expressed his political opinion. In that letter of October 26th that's at Record 395, it says, if you try to inform, it is unsafety for you and your family. So all three of those letters were an unbroken sequence of asking for money and threatening. So there was not a marked change or any change at all with the publication of his letter. I would just like to mention to the court that in the Borja case, the Tarabat case, and Gonzales-Neira, in all three of those cases the court went to pains to mention that the treatment by the terrorist or the guerrillas became worse after the person expressed their opinion. What do we do with the fact that they've been back to his home since then? Well, I mean, I think that's part of the unbroken course of conduct. I mean, they're after the money. His family apparently had some money.  His father owned a transport company and a grocery and apparently a farm. Apparently this was a place to get money and it didn't take them long to figure that out after they came the first time. So I think the fact that they continue to come back, you know, shows that they're pursuing their original goal of trying to get money. They robbed the family again after he was gone. So you think the fact that he published this article and they said they'd put him on the red list, whatever that is, I don't know what the red list is, you think that's meaningless? I think that it's ambiguous and I think that given the standard of review, this is a substantial evidence standard of review, I think the finder of fact could look at it as the immigration judge did and say that seems to have been an afterthought. That doesn't seem what they were after. It was an afterthought to them to say that do not publish articles and we've already listed you on the red list and you'll face action. That's all an afterthought? They said that, yes, they said that was not what this course of conduct was about and I think that their conclusion is strengthened by the fact that the third letter goes back to purely being about money. They don't mention it in the third letter. He hadn't published another article yet. Your Honor, I just want to, there's two things, I think I'm running out of time and there's two things I want to mention. One is I understand that they've dropped their first point of arguing that the board did not look at the threat of future persecution. So I understand that that is no longer an issue in the case. But I just want to say that in the event that the court were to disagree and find that the evidence did compel a contrary result on the nexus ground, there is, these facts are only assumed facts. They're not conceded in this case. Because the immigration judge made an adverse credibility finding. Didn't the BIA? They did not disapprove it. They simply didn't reach it. So I think under. To send it back to the BIA to determine what their position is on credibility? Yes, well, what I most want is for you to deny the petition for review on nexus. But in the event that that doesn't happen, that I think there is a live credibility question in this case that hasn't been addressed yet. And I think under Ventura that the court would not certainly resolve that by itself. That would require remand. Let me just take a look at what they said. So when the BIA takes an IJA's decision and adopts part of it, you say that means they're reserving the issue of the part they don't adopt? Yes, sir. Why don't they adopt? Because they didn't need to. They solved their problem with the nexus question. They found that even, you know, even assuming his testimony were true that he hadn't approved his case. So they simply did not need to reach that credibility question. Is there a case that says that? Well, you know, I think that the Briones case I think is that kind of case. And also, well, actually the Briones case, actually I would say that the Ventura case is that kind of case where there's a credibility question that has to get decided and, you know, there's something that the board didn't reach. And I know the Briones case, as I recall, is one where the thing that they didn't reach was a credibility question. So the basis for their decision was what? It was that there was no political motivation. Even taking his testimony at face value, that they didn't think that the persecutor or they didn't think that the malice motive was political. They thought it was robbery. They thought there was no reason to believe that any part of their motive was political. But they didn't say that even assuming credibility. Well, you're right. They didn't say that. But I think it's because they did not reach the. They could save everybody a lot of trouble if they decide the case. I mean, how many times should it go back to the board when they? If they decide credibility favorably, is there going to be another issue? Well, I mean, certainly there could be a petition for review on that. It's true. I think that's the Ventura principle. Don't they have anything better to do and doesn't the Justice Department have anything better to do? Nothing better to do than to be here, Your Honor. Coming back forth? It's always a pleasure to be here. Wouldn't credibility have something to do with why they say that it was not a motivation? Well, I mean, if he were not credible, then I think that the whole story would be, you know, water under the bridge. If he weren't credible, I think that they would say, you know, there's no evidence that any of this happened. The credibility question from the IJ finding was pretty dramatic, actually, because it found that he had issued a statement that his written statement was nearly identical to that issued by another Nepalese applicant. That's right. That's actually pretty dramatic and pretty damning in sort of the way that we look at these things. The fact that the board didn't decide this on credibility grounds and limited it to that question, I have to say, raises a question in my mind as to whether the board really was reserving that question. It's a pretty dramatic, pretty obvious credibility finding. Well, you know, I can't speculate as to why they didn't reach it, but they didn't reach it, and it's my understanding of what the law is. They also didn't say that they reserved it. That's true. That's true. You know, I think it would be implicit that they didn't reach it, but they only did specifically discuss the nexus. That's true. They didn't discuss it in any way. If there are no further questions, I will sit down. Thank you. Okay. Thank you. What's your position on that last question? I think it's pretty clear from the fact that the board did not say we need not reach this issue that they did reach the issue. The issue of credibility was briefed extensively, and I think the language in the decision by the board that says we adopt and affirm the decision of the immigration judge to the extent he denied the respondent's claim for asylum, the nexus issue, I think that seems like a clear response to the briefing on the credibility issue. This is probably the most significant issue in the case. I'm sorry? This is probably the most significant question in the case. The nexus? No, the credibility one. The nexus one is sort of a particular issue. How we view the board's decisions where they don't mention an issue is something of sort of general importance. I think it makes sense that where something was so dramatic, as Judge Bivey said, and was so extensively briefed, for the board not to say we need not reach this issue, I think it's pretty clear that they did reach the issue, and they wrote a very concise opinion saying we're affirming on this other basis. I think that's all of my time. You don't have any authority on that either. I do not. This is the first I've heard that argument or that point raised by the government, so I do not. In the brief, didn't they or did they say that it should be remanded on the credibility issue? I don't believe it did, and they only mentioned the credibility issue in the government's brief was a footnote that said the parties agree that that issue is not before this court, which doesn't give any indication either way. All right. Okay. Thank you. Your honors. Thank you both very much. It was a well-done argument, and we appreciate it. And the case just argued is under submission.
judges: Hug, Reinhardt, Bybee